1

2

3

4

5

6

7



**FILED**

OCT - 1 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

8          IN THE UNITED STATES DISTRICT COURT

9         FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  CHAD DIAS,                              )   No. C 12-05146 BLF (PR)
                                           )
12              Petitioner,                 )   **ORDER DENYING PETITION FOR**
                                           )   **WRIT OF HABEAS CORPUS;**
13       v.                                 )   **DENYING CERTIFICATE OF**
                                           )   **APPEALABILITY**
14  CONNIE GIPSON, Warden,                  )
                                           )
15              Respondent.                 )
                                           )
16  _____    )

17       Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas

18  corpus pursuant to 28 U.S.C. § 2254.[1]  The Court ordered Respondent to show cause why

19  the petition should not be granted.  Respondent has filed an answer addressing the merits

20  of the petition.  Petitioner has filed a traverse.  Having reviewed the briefs and the

21  underlying record, the Court concludes that Petitioner is not entitled to relief based on the

22  claims presented and denies the petition.

23

24                          **PROCEDURAL HISTORY**

25       On December 28, 2005, Petitioner was charged with first degree murder of Christy

26

27  _____

28       [1]This matter was reassigned to this Court on April 17, 2014.

1   Chan, (Pen. Code § 187),[2] attempted murder of George Tang, (§§ 187 and 664), and

2   robbery, (§ 211).  It was also alleged that Petitioner committed the murder in the course

3   of a robbery as a special circumstances, (§ 190.2(a)(17(A)), the attempted murder was

4   deliberate and premeditated, (§ 664(a)), and Petitioner personally discharged a firearm

5   causing great bodily injury, (§§ 12022.5(a) and 12022.53(d)).[3]

6          On September 5, 2007, Petitioner's first trial resulted in a mistrial due to a hung

7   jury. (3 CT 782-83.)[4]  On August 5, 2008, Petitioner's second trial concluded with the

8   jury finding Petitioner guilty of first degree murder, attempted murder and robbery.  The

9   jury found true the premeditation allegation for the attempted murder, but not the robbery

10  special circumstances or the firearm allegation. (5 CT 1232-38.)  On December 12, 2008,

11  Petitioner was sentenced to 25 years to life for the first degree murder conviction,

12  followed by a consecutive term of life with the possibility of parole for the attempted

13  murder conviction; the court stayed the sentence on the robbery conviction. (5 CT 1310-

14  15.)

15         Petitioner appealed his conviction, and the state appellate court affirmed on May

16  26, 2011. (Ans. Ex. 12.)  The state appellate court also denied his companion petition for

17  writ of habeas corpus.  (Id., Ex. 13.)  On August 10, 2011, the state high court denied

18  review and denied the habeas petition.  (Id., Exs. 16 & 17.)

19         Petitioner filed the instant federal habeas petition on October 3, 2012.

20  ///

21  ///

22  ///

23  ─────────────────────

24         [2]All future statutory references are to the California Penal Code unless otherwise

25  indicated.

26         [3]Petitioner was jointly charged with codefendant Richard Lewis, but their cases

27  were severed on April 2, 2007. (1 CT 290.)  Lewis was ultimately acquitted.

28         [4]3 CT 782-83 refers to the Clerk's Transcript, (Ans., Ex. 2), Volume 3, pages 782
    through 783.

# BACKGROUND[5]

George Tang was a marijuana dealer in San Francisco who typically sold his product out of his car at prearranged locations around the Sunset district. He was sometimes accompanied by his girlfriend, Christine Chan, although she was not personally involved in making the sales.

Tang met Michael Bonds, who he knew as "Bons," in 2004, and began supplying him with marijuana. Bonds lived with Quentin Lewis in the Hayes Valley area of San Francisco. Richard Lewis, who was Quentin's brother and appellant's codefendant in this case, ostensibly lived at the same address but frequently stayed with appellant, who lived in the city of Richmond. Appellant's street name was "Gutter."

In February 2005, Richard Lewis asked Bonds about buying a pound of marijuana, and Bonds made arrangements with Tang to do so. Bonds, Lewis and appellant met up at a gathering in Richmond, where appellant told Bonds that he wanted to personally do the deal and would go with him. Richard Lewis stayed behind while Bonds and appellant drove to San Francisco and met another friend of Bonds's, who was also buying marijuana from Tang.

Bonds used appellant's cell phone to call Tang and arranged to meet at 41st Avenue and Wawona in the Sunset District. Tang was surprised to receive a call from Bonds on a phone with a 510 area code and Bonds explained he was using a phone that belonged to his friend "Gutter." When Tang arrived at the designated location, he called this number and spoke to Bonds. It was about 7:00 in the evening and it was already dark outside.

Appellant walked over to Tang's car and got in the back seat behind Chan, who had accompanied Tang. Tang looked over his shoulder, glanced at appellant (whom he understood to be "Gutter") and told him the marijuana was in a bag on the floor behind the driver's seat. Appellant picked up the bag, put it in a pack he was carrying, paid Tang, and left.

During the next few weeks, Tang exchanged several phone calls with the 510 area code number he had stored in his cell phone during the deal involving appellant and Bonds. Tang always spoke to the same persons – whom Tang assumed to be Gutter (appellant) – and the calls concerned the purchase of more marijuana. The person on the phone mentioned at some point that he lived in Richmond.

On March 1, 2005, Tang received a call from the 510 phone at 11:00 in the morning and was asked about purchasing two pounds of marijuana, which Tang agreed to sell for the price of $8,200. The voice on the phone was the one Tang associated with Gutter. The two men exchanged calls throughout the day and ultimately agreed to meet at 7:00 p.m. in the parking lot behind a restaurant at 20th Avenue and Irving

---

[5]The facts of this case are taken from the California Court of Appeal opinion in *People v. Dias*, No. A124393 (Cal. App. 1 Dist. May 26, 2011). (Ans. Ex. 12 ("Op").)

Street in the Sunset district.

Tang drove with Chan to the designated meeting place at about 7:00 p.m. and called the 510 number. A voice that Tang ultimately identified as Richard Lewis's answered and said he was concerned that there were too many people in the parking lot. [FN3] Tang suggested meeting at 18th Avenue and Noriega Street instead, and the caller agreed. When Tang arrived at 18th Avenue and Noriega, he called the 510 number and the person who answered told Tang he was parked behind him.

> FN3. At the combined preliminary hearing of appellant and Lewis, Tang heard the two of them speaking and recognized the voice of Richard Lewis as the one he had heard over the phone when calling from the restaurant lot.

Tang looked in his rearview mirror and saw two people sitting in a car. The driver had "dreads," sticking out three or four inches, though Tang could not tell the person's race or gender. [FN4] The passenger, who was wearing a hooded jacket and had some kind of "baseball glove" in his hand, got out of the car and into Tang's car, where he sat in the back seat behind Chan. Tang glanced at him and recognized his eyes as belonging to the man he knew as Gutter. Tang said, "What's up?" and the man shot him in his left eye. Dazed from his injury, Tang heard Chan say, "Baby," followed by two more shots. A neighbor who heard the noise and looked out the window saw a tall man wearing a hooded sweatshirt get out of the passenger side of Tang's car and run to an awaiting car, which sped away. Tang, who was still conscious but in a state of confusion, opened the rear door and saw that the marijuana was gone.

> FN4. It was rainy and dark outside.

Tang placed a large amount of cash that he was carrying in the console of the car and tried unsuccessfully to call 911 for help. The police arrived and Tang told one of the officers, "A [B]lack guy shot me." Tang was transported to the hospital, where he was treated for his gunshot injury but lost his left eye. Chan had also been shot and died at the scene.

Clayton Klein lived in Stockton with his girlfriend and was good friends with Richard Lewis. On the night of the shooting, Lewis called Klein's home repeatedly to say he was coming over. Klein arrived home from work at about 4:00 a.m. and found Lewis and appellant (whom he had never met before) waiting. The pair had brought a large duffel bag with them that appeared to contain marijuana, and appellant was carrying a handgun in his waistband. Appellant and/or Lewis expressed an interest in watching the Bay Area news and then spent what was left of the night at Klein's before leaving the following morning.

Meanwhile, Tang was interviewed by police at the hospital where he was being treated. He finally lied about what had happened because he was worried about being arrested, but he acknowledged that the shooting had been committed during a marijuana deal after he learned that Chan had died. He told the police that Gutter, a Black man from Richmond, had been the shooter, and that Gutter's number was stored on his cell phone under "Bons." He described the man who had shot him as tall and

bald, and indicated he could really only see his eyes.

Police traced the cell phone number that Tang provided for Gutter and determined that it belonged to appellant, an African-American man who lived in the city of Richmond and owned a silver Chevrolet Nova. They prepared a photographic lineup that included a picture of appellant. Tang said he was "not so sure" appellant's photograph was Gutter, but that it looked like him based on the eyes, although the hair was different. Tang did not think he could make an identification during a live lineup. The police showed Tang a different photographic lineup containing a picture of Richard Lewis. Tang thought that Lewis's eyes were similar to those of the person who had shot him, although his hair was longer than the shooter's. He later identified Lewis as having hair similar to the driver of the car in which the shooter fled.

Appellant, who is over six feet tall, was arrested at his home in Richmond, where officers seized his cell phone, a batting glove, a nine-millimeter bullet, and a black jacket. Appellant's hair appeared to have been recently braided. Richard Lewis was arrested with his friend Montae Howard several days later after the shooting while they were meeting with appellant's mother. Lewis was 5'8" tall and weighed about 180 pounds and Howard was 5'8" tall and weighed about 165 pounds; both had long braids.

Appellant was interviewed by the police after being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. He acknowledged that the 510 area code phone belonged to him and that he had not loaned it to anyone. He said he had called Tang on March 1, 2005 to purchase a small amount of marijuana and had exchanged several calls with him during the day, but at about 6:00 that evening told Tang that he was too tired to go through with the deal. Appellant said he fell asleep at his house but awoke later that night and drove to Stockton to hang out with Clayton Klein. The officers had not provided appellant with any details regarding the crime they were investigating, but when they told him Tang had been shot he volunteered, "And I was the last person to talk to him." Appellant denied owning a gun, but told police he had one in the past and used it to shoot a neighbor's television set several months before.

Police tracked down the neighbor whose television appellant had shot and recovered bullet fragments from inside the damaged set. A firearms expert who examined the fragments and compared them to those recovered at the crime scene concluded that it was more likely than not that the same gun was used to shoot the television set and to shoot Tang and Chan.

The cell phone records of Tang, appellant, and Richard Lewis showed the general location of those phones on the date of the shooting, based on the cell towers that serviced each call. The records show that appellant and Lewis had driven from Richmond to San Francisco, to an area that would have included the restaurant at 20th Avenue and Irving Street, at about 7:30 p.m. When a call was made between appellant's phone and Tang's at 7:34 p.m., both were using the same cell tower in the Sunset district. Five minutes later, Tang's phone made an unsuccessful call to 911. In the hours after the shooting, appellant's and Lewis's phone records show travel to Richmond and then to Stockton, where they

1    remained until late morning the following day.

2        Appellant and Richard Lewis were jointly charged by information
     with the murder of Chan and the attempted murder and robbery of Tang.
3    (§§ 187, 187/664, 211, 212.5.)  As to appellant only, the information
     alleged a felony-murder special circumstance (murder during the
4    commission of a robbery) and enhancements for personal use of a firearm
     and personally using and discharging a firearm causing death or great
5    bodily injury.  (§§ 190.2 subd. (a)(17)(A), 12022.5, subd. (a), 12022.53,
     subds. (c), (d), & (e).)  The cases were severed and Lewis was acquitted
6    of all charged following a jury trial.  Appellant was separately tried and a
     mistrial was declared after the jury was unable to reach a unanimous
7    verdict.

8        During Lewis's trial and appellant's first trial, the prosecution had
     taken the position that appellant and Lewis had planned the robbery
9    together, that appellant was the person who shot Chan and Tang, and that
     Lewis drove the getaway car.  In appellant's first trial, the court had
10   refused a prosecution request for jury instructions on aiding and abetting
     as an alternative basis of liability, on the ground that such a theory was
11   factually inconsistent with the position taken to date and that allowing
     such instructions would deprive the defense of adequate notice.
12
         In anticipation of appellant's retrial on the same charges following
13   the mistrial, the prosecutor filed a motion seeking leave to proceed on the
     alternative theory that he was guilty of murder under the felony-murder
14   rule if the jury could not determine whether he was the shooter but found
     that he aided and abetted the underlying robbery.  The prosecutor
15   emphasized during argument on the motion that he still intended to argue
     that appellant was the shooter; nonetheless, the evidence showed that
16   appellant had arranged to purchase the marijuana from Tang and was in
     the Sunset district at the time of the shooting, and the jury should not be
17   tethered to the "shooter" theory in the event it had a reasonable doubt
     regarding appellant's exact role in the crime.  The trial court ruled that it
18   would allow the prosecution to proceed on aiding and abetting as an
     alternative theory, given that the defense now had adequate notice that the
19   argument would be presented.

20       The case proceeded to trial before a jury for the second time, with
     appellant's primary defense being that Tang's identification was not
21   reliable and that other persons associated with Michael Bonds and his
     group, specifically, Montae Howeard and Richard Lewis's brother
22   Quentin Lewis, might have been involved instead.  Quentin Lewis (who
     was bald, as Tang had described the shooter to police) was employed as a
23   manual street sweeper with the San Francisco Department of Public
     Works, and though records indicated that he was on duty in the
24   Tenderloin district between 12:00 p.m. and 9:00 p.m. on the day of the
     robbery, he was not directly supervised at all times.  Montae Howard's
25   cell phone was used in an area near the city of El Cerrito (which covered
     the East Bay area where appellant lived) at about 6:30 p.m. on the day of
26   the shooting, and was then inactive until about 8:30 p.m., when it was
     again used in the East Bay.
27
         The jury convicted appellant of first degree murder, attempted
28   murder with premeditation, and second degree robbery.  (§ 187, 167/664,

1    subd. (a), 211, 212.5.) It found the special circumstance and firearm
2    enhancement allegations not true. The court sentenced appellant to prison
for 25 years to life on the murder count plus a consecutive life sentence on
3    the attempted murder count and stayed the sentence for robbery under
section 654.

4    (Op. at 2-7.)

## DISCUSSION

### I. Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to

1    the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not

2    issue the writ "simply because that court concludes in its independent judgment that the

3    relevant state-court decision applied clearly established federal law erroneously or

4    incorrectly." *Id.* at 411.

5        "Under the 'unreasonable application' clause, a federal habeas court may grant the

6    writ if the state court identifies the correct governing legal principle from [the Supreme

7    Court's] decisions but unreasonably applies that principle to the facts of the prisoner's

8    case." *Williams*, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable application'

9    clause, . . . a federal habeas court may not issue the writ simply because that court

10   concludes in its independent judgment that the relevant state-court decision applied

11   clearly established federal law erroneously or incorrectly." *Id.* at 411.  A federal habeas

12   court making the "unreasonable application" inquiry should ask whether the state court's

13   application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

14   The federal habeas court must presume correct any determination of a factual issue made

15   by a state court unless the petitioner rebuts the presumption of correctness by clear and

16   convincing evidence.  28 U.S.C. § 2254(e)(1).

17       The state court decision to which Section 2254(d) applies is the "last reasoned

18   decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991);

19   *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned

20   opinion from the highest state court considering a petitioner's claims, the court "looks

21   through" to the last reasoned opinion.  *See Ylst*, 501 U.S. at 805.  In this case, the last

22   reasoned opinion is that of the California Court of Appeal, affirming the conviction.

23   (Ans. Ex. 12.)

24       The Supreme Court has vigorously and repeatedly affirmed that under AEDPA,

25   there is a heightened level of deference a federal habeas court must give to state court

26   decisions.  *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v.*

27   *Richter*, 131 S. Ct. 770, 783-85 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per

28   curiam).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a

1 highly deferential standard for evaluating state-court rulings' and 'demands that

2 state-court decisions be given the benefit of the doubt.'" *Id.* at 1307 (citation omitted).

3 With these principles in mind regarding the standard and limited scope of review in which

4 this Court may engage in federal habeas proceedings, the Court addresses Petitioner's

5 claims.

6 **II.    Legal Claims and Analysis**

7     Petitioner claims the following as grounds for federal habeas relief: (1) the trial

8 court erred by denying his *Wheeler/Batson* motion ; (2) trial counsel was ineffective for

9 failing to lodge the transcripts from Petitioner's first trial and that of his codefendant

10 which resulted in prejudice at the appeal level; (3) trial counsel was ineffective for failing

11 to properly counter the prosecution's theory that Petitioner was guilty as an aider and

12 abetter; and (4) the introduction of an aiding and abetting theory violated his right to due

13 process, as the prosecution had previously taken the position that appellant was the

14 shooter.

15     **A.    *Wheeler/Batson* Motion (Claim 1)**

16     Petitioner claims that when the prosecution used peremptory challenges to excuse

17 three African-American jurors, the trial court erred in denying defense counsel's

18 *Batson/Wheeler*[6] motions that the challenges were race-based.

19     The California Appellate Court summarized what occurred at trial and then stated

20 the applicable law:

21     A.    Procedural History

22         The prosecutor used his peremptory challenges to exclude three of
the four jurors on the panel who appeared to be African-American. The
23     first of these was Juror H., a 50-year-old freelance musician who indicated
in his written questionnaire that he, along with his girlfriend, had been the
24     victim of a 1999 robbery committed by four men. He explained during
voire dire that the police had arrested suspects who he believed to be the
25     robbers, but he had not made an identification. Juror H. stated that he

26

27     [6]In California, a party who believes his opponent is using his peremptory
28 challenges to strike jurors on grounds of group bias alone may raise the point by way of a
timely motion. *See People v. Wheeler*, 22 Cal. 3d 258, 280 (1978).

believed the police had the right people, but he would not have been able
to identify them in court because he was not 100 percent sure it was them.
He elaborated, "[If] I had to go in and testify, I would never do that,
because if it's not completely 100 percent that I'm sure, I'd potentially be
putting someone in jail for life." Juror H. also suggested that several
people in the jury pool appeared to be biased against African-Americans,
and he expressed concern about the group working together.

The second prospective juror at issue was Juror J., a 31-year-old
woman who worked as a medical assistant at a local hospital. In the
section of the written questionnaire asking about potential witnesses, Juror
J. indicated that the name Montae Howard sounded familiar to her and
that she saw a lot of patients at the hospital where she worked. She also
reported that her ex-husband had committed acts of domestic violence
against her, and that the police who responded were "very kind to [her]
and assisted [her] in every way possible." Asked whether she had
contributed time or money to any organization seeking to change the
criminal laws, she reported that a friend of hers who was bipolar had been
shot by the police and she had gone to a meeting to support his mother. In
response to a question about whether she would automatically believe or
disbelieve the testimony of a witness who had been criminally involved in
the events of this case, she wrote that she had seen an episode of the
television show "48 Hours" in which the victim's missing cell phone was
called and answered by a person who provided valuable information that
helped solve the case.

When questioned during voire dire, Juror J. stated that she could
not link the name Montae Howard with a face or with other information,
but that it did seem familiar to her. She agreed that she would let the
court know if she recognized someone who came into the courtroom.
Juror J. said she did not have any bad feelings about the criminal justice
system as a result of the domestic violence case, which was not
prosecuted. Asked about her friend who had been shot by the police, she
explained that he had failed to take his medication and became irate in a
movie theatre when he was not allowed to smoke. The police arrived and
asked for his identification; they shot him because they thought he was
reaching for a weapon when in fact he was reaching for his wallet. Juror
J. acknowledged that there were two sides to every story but she had been
very upset about her friend's death and had attended a meeting about the
incident.

The prosecutor initially challenged Juror J. for cause based on his
concern that she might know Montae Howard. The court denied the
challenge as too speculative, but indicated that it would check with Juror
J. if Howard testified to see whether she recognized him. The prosecutor
exercised his second peremptory challenge against Juror H. and his tenth
peremptory challenge against Juror J. Defense counsel objected under
Batson/Wheeler, arguing that there was no reason for the prosecutor to
have excused these jurors other than their race. The court found that a
prima facie case of discrimination had been made and asked the
prosecutor to explain his reasons for striking the jurors.

The prosecutor first addressed Juror J. and explained that his main
reason for removing her was her possible knowledge of Montae Howard.
He noted that he had initially asked that she be removed for cause, and

pointed out that other jurors who knew a witness had been excused. The prosecutor gave as additional reasons: (1) Juror J. was from Pinole, where some of appellant's family lived, and she might have sympathy for them as a result; (2) she had attended a meeting about a friend who was shot by the police, which raised concerns about her views of the police; (3) she had seen a television news show involving a cell phone taken from a crime victim, and one of the potential issues in this case was whether appellant had always possessed his cell phone; (4) when asked in her questionnaire whether she would automatically believe or disbelieve a witness who had been granted immunity, she said it would "depend[] on the witness credibility, testimony, and involvement. (Maybe not the actual shooter?)," raising concerns about how she might evaluate out-of-court statements by Richard Lewis (whom the defendant might suggest was the shooter); and (5) she was soft spoken in her responses to questions.

The trial court denied the *Batson/Wheeler* motion regarding Juror J., finding that the prosecutor was motivated by her possible knowledge of Montae Howard, a potentially significant witness. This concern, combined with the information about her friend being shot by police, the program she had watched about the lost cell phone, and, to a lesser extent, her connection with Pinole, "shows me that this was not a misuse of peremptory challenges." The court later noted that the other circumstances cited by the prosecution would not themselves have supported the challenge, but that Juror J.'s familiarity with the name Montae Howard was sufficient.

Turning to Juror H., the prosecutor explained that he had been very concerned about that jurors reluctance to identify the men who had robbed him in 1999. The prosecutor noted that Juror H. believed the police had arrested the right people but would not testify unless he was 100 percent sure of their identities. Tang's identification of appellant as the shooter was going to be a central issue of the trial, and Juror H. was "raising the bar of identification for the [P]eople in terms of what a witness must do, requiring a witness to come into court and testify 100 percent that that's the person." The prosecutor also stated that Juror H. appeared to be opinionated and too eager to serve on the jury, having gone out of his way to talk to all of the seated panelists during the break.

The court concluded that the prosecutor's concern about Juror H.'s standard of certainty for eyewitness identification was an appropriate basis for a challenge in a case where eyewitness identification by the victim would be a major issue. It did not believe the other reasons stated by the prosecutor were justified, but denied the *Batson/Wheeler* motion based on Juror H.'s views regarding eyewitness identification.

Juror R., who worked for a media firm, was then called into the box. In his written questionnaire he had described negative contacts with the police: "Believe I and an African[-American] friend have been racially profiled and wrongly detained for suspicion of trafficking drugs when we were driving a U-Haul truck from Michigan to New York. The police brought out drug dogs while we were put in the back seat of cop car.... Shall I continue? They lied to me in college as well. And I was detained for 'illegal solicitation' again with no charges." In response to the question whether he would judge the testimony of a law enforcement

officer differently from that of other witnesses, he wrote, "I'd always be wondering if they were telling the truth, mainly because the entertainment/media dogma has put so much skepticism into the legitimacy of a police officer's ethics." Asked during voir dire about his views of the police, he explained, "[T]hat experience of just blatant, what I feel was blatant racial profiling, other stories from my friends who have been subject to police brutality or unjust accusations, I just have a pretty bad taste in my mouth for law enforcement in general. As long as I am positive they are telling the truth when they are on the stand, that's fine with me. But, say, something were to come up where the character of the police officer testifying was in question, they had been caught lying in the past or something like that, I'm extremely skeptical about the honesty of the police officer." He added that police officers were very low on the scale of people he trusted.

The prosecutor used his twelfth peremptory challenge to excuse Juror R. and the defense again made an objection under *Batson/Wheeler*. The court found a prima facie case had been made and invited the prosecutor to explain his reasons for the challenge. The prosecutor responded that he did not believe Juror R. was an African-American, but appeared to be of Southeast Asian or Malaysian descent. Asked by the court to state his reasons nonetheless, the prosecutor pointed to Juror R.'s negative experiences with the police and the apparent bias he would harbor against police officer witnesses. The prosecutor also noted that when asked in the questionnaire about the believability of a witness who had been granted immunity, Juror R. had written, "Their testimony could be forced. Why would they implicate themselves even with immunity"? The prosecutor pointed out that Tang had been granted immunity from prosecution for drug trafficking in exchange for his testimony.

The court denied the *Batson/Wheeler* motion, noting that while Juror R.'s views about the police did not give rise to a challenge for cause, they did raise legitimate concerns about whether he could fairly consider the testimony of law enforcement officers.

B.    Analysis

A defendant who suspects that a juror has been challenged for a racially discriminatory reason must raise an objection (commonly known as a *Batson* or *Wheeler* motion) at which point the trial court will employ a familiar three-step analysis: "First, [it] must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination." (*Lenix, supra,* 44 Cal.4th at p. 612.) The trial court here determined that the defense made a prima facie case as to all three of the jurors at issue, meaning that our focus is on the third stage of the *Batson/Wheeler* analysis and whether the defense had proved the ultimate issue of a discriminatory motivation for the peremptory challenges.

We review the court's ruling on purposeful racial discrimination for substantial evidence, giving deference to the trial court's ability to distinguish "bona fide reasons from sham excuses." (*People v. Burgener*

(2003) 29 Cal.4th 833, 864; see also *People v. Watson* (2008) 43 Cal.4th 652, 671' *People v. McDermott* (2002) 28 Cal.4th 946, 971.) "As long as the court makes a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]'" (*People v. Avila* (2006) 38 Cal.4th 491, 541; see also *Lenix, supra,* 44 Cal.4th at [. 626; *Snyder v. Louisiana* (2008) 552 U.S. 472, 477 (*Snyder*).) "The best evidence of whether a race-neutral reason should be believed is often 'the demeanor of the attorney who exercises the challenge,' and 'evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province.""" (*People v. Stevens* (2007) 41 Cal.4th 182, 210.) "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*Lenix,* at pp. 612-613.)

(Op. at 8-13.)

The Equal Protection Clause forbids the exclusion of jurors by peremptory challenge solely on account of their race. *Batson v. Kentucky,* 476 U.S. 79, 89 (1986). *Batson* permits prompt rulings on objections to peremptory challenges under a three-step process. First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93-94. If the defendant makes this showing, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 98. "To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility under the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel." *Mitleider v. Hall,* 391 F.3d 1039, 1047 (9th Cir. 2004); *Lewis v. Lewis,* 321 F.3d 824, 831 (9th Cir. 2003).

"As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis...," particularly when the state court declined to do so. *Jamerson v. Runnels,* 713 F.3d 1218, 1225 (9th Cir. 2013). Comparative juror analysis involves the determination of whether non-challenged jurors possess any of the characteristics on which the prosecution challenged jurors in the protected group. *Boyd v.*

1    *Newland*, 467 F.3d 1139, 1147-48 (9th Cir. 2006). Then the court should "reevaluate the

2    ultimate state decision in light of this comparative analysis and any other evidence

3    tending to show purposeful discrimination to decide whether the state was unreasonable

4    in finding the prosecutor's race-neutral justifications to be genuine." *Jamerson*, 713 F.3d

5    at 1225.

6        The findings of the state trial court on the issue of discriminatory intent are

7    findings of fact entitled to the presumption of correctness in federal habeas review. *See*

8    *Purkett v. Elem*, 514 U.S. 765, 769 (1995). So are the findings of the state appellate

9    court. *See Mitleider*, 391 F.3d at 1050; *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th

10    Cir. 2004). This means that where a challenge to the state court's factual determination is

11    based on extrinsic evidence or evidence presented for the first time in federal court, under

12    28 U.S.C. § 2254(e)(1) the state court's findings of discriminatory intent are presumed

13    sound unless the petitioner rebuts the presumption by clear and convincing evidence.

14    *Kesser v. Cambra*, 465 F.3d 351, 368 n.1 (9th Cir. 2006). Additionally, where review of

15    the state court's factual determination is based entirely on information that was contained

16    in the state court record, under 28 U.S.C. § 2254(d)(2) the federal court must defer to the

17    state court's conclusion that there was no discrimination unless that finding was "'based

18    on an unreasonable determination of the facts in light of the evidence presented in the

19    State court proceeding.'" *Cook v. Lamarque*, 593 F.3d 810, 816 (9th Cir. 2010) (citing 28

20    U.S.C. § 2254(d)(2)) (even though prosecutor gave both persuasive and unpersuasive

21    justifications for strikes, court could not conclude state court's finding of no

22    discrimination was objectively unreasonable where review of voir dire transcript and juror

23    questionnaires showed the most significant justifications in each case were entirely

24    sound); *Kesser*, 465 F.3d at 368 (finding California Court of Appeal's conclusion that a

25    strike was not racially based was an unreasonable determination under 28 U.S.C. §

26    2254(d)(2), and "even satisfies the more demanding standard" of § 2254(e)(1)).

27    Therefore, a federal habeas court can only grant habeas relief "if it was unreasonable to

28    credit the prosecutor's race-neutral explanations for the Batson challenge." *Rice v.*

1    *Collins*, 546 U.S. 333, 338 (2006). "[I]n evaluating habeas petitions premised on a

2    *Batson* violation, 'our standard is doubly deferential: unless the state appellate court was

3    objectively unreasonable in concluding that a trial court's credibility determination was

4    supported by substantial evidence, we must uphold it.'" *Jamerson*, 713 F.3d at 1225

5    (citing *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)).

6        The state appellate court then analyzed and rejected Petitioner's claims as to each

7    challenged juror, starting with Juror H.

8        **1.   Juror H.**

9        The challenge to Juror H. was supported by substantial evidence
     because his responses suggested he might have been particularly critical
10   of Tang's identification of appellant as the shooter, having explained
     during voir dire that he would not identify someone in court unless he was
11   100 percent sure it was that person. A juror's skepticism about
     eyewitness identification is a race neutral reason that supports a
12   peremptory challenge. (See *People v. Irvin* (1996) 46 Cal.App.4th 1340,
     1348, fn. 8, 1354.)

13
     Appellant argues that the prosecutor's discriminatory purpose is
14   evident from his claim (rejected by the trial court) that Juror H. was
     opinionated and overly eager to serve on the jury. Though the court did
15   not find "justification" for the prosecutor's conclusion, this does not make
     the other proffered reasons a pretext for racial discrimination or show that
16   the peremptory challenge was based in substantial part on discriminatory
     motives. (See *Cook v. LaMarque* (9th Cir. 2010) 593 F.3d 810, 814-816
17   [upholding peremptory challenge where record did not support two of the
     six reasons given by prosecutor].) "Although the question of whether the
18   prosecutor's reasons are rational and reasonable weighs into the trial
     court's determination of whether to conclude that they are genuine and not
19   a pretext, whose reasons need not meet any particular standard of
     reasonableness. The only relevant consideration for the trial court is
20   whether the reasons were sincere and nondiscriminatory." (*People v.
     Davis* (2008) 164 Cal.App.4th 305, 313.)

21
     Although he did not raise the issue in the trial court, appellant
22   argues that the prosecutor's reasons for challenging Juror H. do not hold
     water in light of the responses by other jurors who were not excused.
23   "Despite problems inherent in conducting comparative juror analysis for
     the first time on appeal – including the difficulties of comparing what
24   might be superficial similarities among prospective jurors and trying to
     determine why the prosecutor challenged on prospective juror and not
25   another when no explanation was asked for or provided at trial – both the
     [United States Supreme Court] and [the California Supreme Court] have
26   done so on request." (See *People v. Jones* (2011) 51 Cal.4th 346, 364,
     citing *Snyder*, *supra*, 552 U.S. 472, *Miller-El v. Dretke* (2005) 545 U.S.
27   231, and *Lenix*, *supra*, 44 Cal.4th at p. 622.)

28       Appellant notes that Juror H. expressed concerns that others on the

1    panel could not be impartial to African-Americans. He asks us to
     compare this observation with the written comments of a seated Asian
2    juror who questioned her ability to be impartial in a case where the
     victims were Asian, as well as the remarks of another seated juror who
3    commented at one point that she was "not 100 percent positive" she could
     uphold the presumption of innocence, but had experiences "a real strong
4    turnaround" after sitting through two days of voir dire. The comparison
     urged by appellant is not useful because the cited remarks are much
5    different than those made by Juror H. and the prosecutor did not cite Juror
     H.'s concerns about the other jurors' bias as a reason for excluding him
6    from the jury.

7    (Op. at 13-14.)

8         Here, the state appellate court's findings that the prosecutor's proffered reasons

9    were race-neutral and without discriminatory purpose are presumed correct. *See Purkett*,

10   514 U.S. at 769. The prosecutor's main reason for excusing Juror H. was due to his

11   skepticism about the reliability of eyewitness identifications. *See supra* at 11, 15. Juror

12   H. admitted that he had been unwilling to identify the men who had robbed him because

13   he was not "100 percent sure" it was them. *Id.* at 11. Because Tang's identification of

14   Petitioner was a central issue at trial and involved some inconsistencies, the prosecutor's

15   concern that Juror H. was "raising the bar of identification" for eyewitness identification

16   was certainly valid. *Id.*

17        Petitioner mainly challenges the prosecutor's other proffered reasons, *i.e.*, that

18   Juror H. was "opinionated" and "too eager to serve on the jury," which he contends must

19   have been based on Juror H.'s comments about potential racism in the jury pool. *Id.* at

20   11. However, the prosecutor explained that his concern was that Juror H. had too

21   dominant a personality and "would impose his opinion other people." 46 RT 3751. This

22   was certainly a valid concern considering Juror H.'s personal opinion with respect to the

23   absolute certainty of eyewitness identification. Ultimately, a prosecutor's explanation

24   need not be persuasive; unless a discriminatory intent is inherent in the prosecutor's

25   explanation, the reason offered will be deemed race neutral. *See Purkett*, 514 U.S. at

26   768-69 (prosecutor's explanation that he struck black juror because he had long, unkempt

27   hair, mustache and beard was race-neutral and satisfied second step). Even if the other

28   proffered reasons were less persuasive, the prosecutor's most significant justification –

1   that Juror H. would impose too high a bar for eyewitness identification – was sound.

2   Accordingly, it cannot be said that the trial court's finding of no discrimination with

3   respect to Juror H. was objectively unreasonable. *See Cook*, 593 F.3d at 816.

4        The appellate court also engaged in a comparative juror analysis to address

5   Petitioner's argument that the prosecutor's reasons for excusing Juror H. were not

6   credible in light of the responses by other jurors who were not excused.  Petitioner

7   pointed out one Asian juror's comments expressing doubt about her ability to be impartial

8   in a case where the victims were Asian, and another's remark that she was "not 100

9   percent positive" she could uphold the presumption of innocence but had experienced "a

10  real strong turnaround" after sitting through two days of voir dire. *See supra* at 15.  The

11  state appellate court was not unreasonable for finding that the requested comparison was

12  not useful because the cited remarks were very different from those made by Juror H. *Id.*

13  Indeed, the first cited juror's questionable ability to be impartial with respect to Asian

14  victims was not a characteristic on which the prosecutor excused Juror H. *See Boyd*, 467

15  F.3d at 1147-48.  Nor was the second cited juror's comment questioning her ability to

16  uphold the presumption of innocence comparable to any of Juror H.'s statements: her use

17  of the phrase "not 100 percent positive" was not even used in the same context as Juror

18  H.'s use of the phrase.  Accordingly, Petitioner's claim that the prosecutor had

19  discriminatory motives for excusing Juror H. based on comparative juror analysis is

20  without merit.

21        **2.    Juror J.**

22        The state appellate court also found that the prosecution had nondiscriminatory

23  reasons for excusing Juror J.

24              We next turn to Juror J., who was excused primarily because she
            recognized the name Montae Howard, a potential witness who was
25          arrested with Richard Lewis a few days after the shooting and who the
            defense would try to suggest was Lewis's actual cohort in the robbery-
26          murder.  Though Juror J. could not recall why she was familiar with the
            name, the prosecutor was not required to take the chance that one of the
27          sitting jurors might know a man whose culpability for the crime was at
            issue.  Additionally, Juror J.'s experience with a friend who had been shot
28          by the police and her viewing a television show in which a crime victim's

1    cell phone had helped solve the crime were neutral reasons of the
     challenge – circumstances that the court implicitly found to be genuine
2    even if they would not themselves have rebutted the prima facie showing
     of discrimination.

3
         Appellant complains that the prosecutor also relied on Juror J.'s
4    connection with the Pinole neighborhood where appellant's family
     apparently resided, as a reason for striking her from the jury. He claims
5    that in offering this reason, the prosecutor effectively admitted that the
     challenge to Juror J. was "based in part of the impermissible notion that
6    residence near the predominantly African-American area of Richmond
     automatically creates a bias in favor of an African-American defendant."
7    We disagree. The prosecutor was not suggesting that the racial makeup of
     Pinole or its neighboring communities made its residents more likely to
8    sympathize with African-American defendants; rather, he expressed
     concern about a geographical connection between the juror and the
9    defendant's family that might engender sympathy. "Where residence is
     utilized as a link connecting a specific juror to the facts of the case, a
10   prosecutor's explanation based on residence could rebut the prima facie
     showing [of discrimination]." (*People v. Williams* (1997) 16 Cal.4th 153,
11   191.) Though the court concluded the Pinole connection was a trivial
     reason that would not have justified the challenge to Juror J. if considered
12   alone, it implicitly found that reason to be genuine in the sense of being
     nondiscriminatory. We defer to that finding. (See *Lenix, supra,* 44
13   Cal.4th at pp. 613-614.)

14   (Op. at 14-15.)

15        The record shows that the prosecutor initially challenged Juror J. for cause based

16   on the possibility that she knew one of the potential witnesses, Montae Howard, whom

17   the defense would try to suggest was the actual cohort with Richard Lewis in the robbery-

18   murder and not the Petitioner. The trial court denied the challenge as too speculative.

19   *See supra* at 10. Accordingly, it was credible for the prosecutor to decide to exercise a

20   peremptory challenge to have her removed rather than take the chance that she might

21   know someone whose culpability for the crime was at issue. It should also be noted that

22   other potential jurors who had indicated that they knew a witness had been excused

23   without much debate. (*See* 43 RT 3224-3225, 46 RT 3730-3732.) The record shows that

24   Montae Howard was indeed a significant figure in the trial as Respondent points out: the

25   defense mentioned Montae Howard several times during opening statements, his name

26   came up in questioning dozens of times, and both parties mentioned him numerous times

27   during closing arguments. (Ans. at 16.)

28        Secondly, the fact that Juror J. lived in Pinole, where some of Petitioner's family

1    members lived, was another valid, race-neutral reason for excusing her because of the

2    concern that the geographical connection with the family might make her sympathetic

3    towards Petitioner, regardless of their racial similarities.  There is no evidence in the

4    record to support Petitioner's argument that the prosecutor was really motivated by the

5    notion that "residence near the predominantly African-American area of Richmond

6    automatically creates a bias in favor of an African-American defendant." (Op. at 15.)

7    There was nothing inherently discriminatory in the prosecutor's explanation, and

8    therefore the state appellate court reasonably deemed it race neutral. *See Purkett*, 514

9    U.S. at 768-69; *Rice*, 546 U.S. at 338.

10         Because the state appellate court did not do a comparative juror analysis for Juror

11   R., this Court must do so under *Jamerson*, 713 F.3d at 1225.  The Court has reviewed the

12   questionnaires of the seated jurors, (1 SCT 001-210),[7] to determine whether non-

13   challenged jurors possessed the same characteristics on which the prosecution challenged

14   Juror J, *i.e.*, whether a juror knew or potentially knew any of the individuals involved in

15   the trial and whether any of the lived in or near Pinole. *Boyd*, 467 F.3d at 1147-48.  The

16   Court will focus on these two characteristics as they were the most significant

17   justifications proffered by the prosecution and challenged by Petitioner. *Cook v.*

18   *Lamarque*, 593 F.3d at 816.  As to the first characteristic, the last two pages of the

19   questionnaire explicitly listed all the names of the potential witnesses, which included

20   civilians and law enforcement/public service employees, who might be called at trial, and

21   required the juror to circle any name which they knew or thought they knew and explain

22   how they knew that person.  None of the seated jurors indicated any knowledge of the

23   individuals listed on the questionnaire.  (1 SCT 014-015, 029-030, 044-045, 059-060,

24   074-075, 089-090, 104-105, 119-120, 134-135, 149-150, 164-165, 179-180, 194-195, and

25   209-210.)  Secondly, all of the seated jurors lived in San Francisco at the time, and none

26   of them indicated that they had ever previously lived in Pinole.  (1 SCT 002, 017, 032,

27

28         [7] 1 SCT 001-210 refers to the Supplemental Clerk's Transcript (Ans., Ex. 3),
     Volume 1 at pages 001-210.

1   047, 062, 077, 092, 107, 122, 137, 152, 167, 182, and 197.)

2       The Court has also reviewed the transcript of the voir dire. (43 RT 3185-3328, 44

3   RT 3329-3496, 45 RT 3497-3667, 46 RT 3668-3859, and 47 RT 3860-3945.) On the first

4   day of jury selection, the trial court addressed the prospective jurors and asked if any of

5   them knew either the lawyers or the defendant in this case; there was no response. (43

6   RT 3195.) This question was repeated each time jurors were excused and new jurors

7   were seated. The trial court also referred to the list of potential witnesses from the

8   questionnaire and asked if any of the potential jurors had become aware that they knew

9   any of the witnesses since their initial responses on the questionnaire; there was no

10   response. (*Id.*) The potential jurors were also advised to inform the court if they later

11   realized that they knew or recognized any of the witnesses as they came up in trial, and to

12   do so before the testimony began. (*Id.* at 3196.) Jury selection was extensive and lasted

13   five days. During that time, none of the seated jurors or alternates indicated that they

14   knew, or possibly knew, any potential witnesses in the trial, nor did they indicate any

15   prior residence in Pinole. (43 RT 3276-3277, 3291, 3331-3335; 44 RT 3366-3370, 3431-

16   3433, 3441-3442; 46 RT 3715-3718, 3724-3725, 3728-3730, 3734-3739, 3780-3781,

17   3787-3792, 3782-3786, 3805-3807, 3812-3815, 3817-3820, 3821-3824; 47 RT 3861-

18   3862, 3907-3908, 3915-3918, 3922-3923, 3929-3932, 3933-3935.) Because the record

19   shows that none of the seated jurors and alternates shared Juror J.'s challenged

20   characteristics, this Court finds that the state appellate court was not unreasonable in

21   finding that the prosecutor's race-neutral justifications were genuine. *See Jamerson*, 713

22   F.3d at 1225. Accordingly, Petitioner's *Batson* challenge of Juror J. also fails under

23   comparative juror analysis.

24       **3.**    **Juror R.**

25       Lastly, the state appellate court found no merit in Petitioner's challenge of Juror J.

26          Finally, substantial evidence supports the denial of the
          *Batson/Wheeler* motion as to Juror R., whose attitude toward law

27          enforcement would have been troubling to any prosecutor who intended to
          call police officers as witnesses. Courts have repeatedly upheld

28          peremptory challenges that are based on a prospective juror's negative

experiences with law enforcement. (E.g., *People v. Turner* (1994) 8 Cal.4th 137, 171, disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5; *People v. Walker* (1988) 47 Cal.3d 605, 625-626.) Though appellant points to other prospective jurors who expressed similar skepticism of police officers, these jurors were either removed for cause, excused by the prosecution or excused by the defense. Appellant does not suggest that anyone who actually served on the jury had expressed views about the police that were similar to Juror R.

Appellant suggests that this case had a "clear subtext of racial animosity." He points to the questionnaire responses of seated jurors who expressed negative views about African-Americans and criminality; e.g., that high crime areas tend to be African-American neighborhoods and that African-Americans commit more crimes than other groups. These written comments by the seated jurors shed no light on the question before us – whether the prosecutor's reasons for excusing Jurors H., J., and R. were genuine and nondiscriminatory. (See *Jones, supra,* 51 Cal.4th at p. 365.) Appellant makes no argument that the seated jurors who expressed these views should have been excused for cause, and defense counsel accepted the jury with five peremptory challenges remaining. We presume defense counsel was satisfied about the ability of these jurors to be fair.

Finally, it is significant, though not dispositive, that the final jury included an African-American, though the prosecution had eight peremptory challenges remaining. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 734; *People v. Dunn* (1995) 40 Cal.App.4th 1039, 1053-1054; *Burks v. Borg* (9th Cir. 1994) 27 F.3d 1424, 1429.) The court may "[r]ely on the fact that the government waived available strikes and permitted members of a racial minority to be seated on a jury to support a finding that the government did not act with discriminatory intent in striking another member of the same minority group." (*United States v. Canoy* (7th Cir. 1994) 38 F.3d 893, 900, and cases cited therein.)

(Op. at 15-16.)

The state appellate court's determination was not unreasonable. The record shows that Juror R. described extensively his negative experiences with the police whom he accused of racial profiling in his questionnaire. *See supra* at 11-12; (7 SCT 1267). During voir dire, Juror R. repeatedly expressed his distrust of police officers: "I just have a pretty bad taste in my mouth for law enforcement in general"; "it's just police officers, I don't trust them that much"; and he was "extremely skeptical about the honesty of police officers." (46 RT 3794-95.) The prosecutor, who intended to call police officers as witnesses, had a valid concern with respect to Juror R.'s bias toward the credibility of police officers. Accordingly, the state appellate court was not unreasonable for finding that this concern was genuine and race-neutral.

1      In his appeal, Petitioner cited other jurors who expressed skepticism of police

2  officers to suggest that the prosecutor treated Juror R. differently under comparative juror

3  analysis. But the state appellate court found that these cited jurors were all removed for

4  cause or excused by either the prosecution or defense before the prosecutor had the

5  opportunity to do so. *See supra* at 20. Petitioner failed to identify any seated juror who

6  expressed similar views about the police as Juror J. *Id.* Accordingly, it was not

7  unreasonable for the state appellate court to find that comparative juror analysis did not

8  advance Petitioner's claim.

9      Furthermore, the state appellate court also considered the "totality of the relevant

10  facts" in finding that the defense accepted the seated jurors with five remaining

11  peremptory challenges, the prosecutor with eight peremptory challenges remaining, and

12  that the final jury included an African-American. *See supra* at 21. The state court's

13  findings were not an unreasonable determination of the facts in light of the evidence

14  presented. *Cook*, 593 F.3d at 816. Petitioner has failed to show that the state court was

15  unreasonable to credit the prosecutor's race-neutral explanations for excusing Jurors H.,

16  J., and R. Accordingly, under the doubly deferential standard, the Court finds that the

17  state appellate court was not objectively unreasonable in concluding that a trial court's

18  credibility determinations were supported by substantial evidence. *Jamerson*, 713 F.3d at

19  1225. Petitioner is not entitled to habeas relief on this claim.

20     **B.   Ineffective Assistance of Counsel (Claims 2 and 3)**

21      Petitioner's second claim is that trial counsel was ineffective for failing to lodge

22  the transcripts from his first trial and the trial of his codefendant which resulted in

23  prejudice at the appeal level. Petitioner's third claim is that trial counsel was ineffective

24  for failing to properly counter the prosecution's theory that Petitioner was guilty as an

25  aider and abetter.

26      In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

27  Petitioner must establish two things. First, he must establish that counsel's performance

28  was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under

1  prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

2  Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*,

3  that "there is a reasonable probability that, but for counsel's unprofessional errors, the

4  result of the proceeding would have been different." *Id.* at 694. A reasonable probability

5  is a probability sufficient to undermine confidence in the outcome. *Ibid.* A court need

6  not determine whether counsel's performance was deficient if the lack of prejudice is

7  clear. *Id.* at 697.

8      The *Strickland* framework for analyzing ineffective assistance of counsel claims is

9  considered to be "clearly established Federal law, as determined by the Supreme Court of

10  the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v.*

11  *Pinholster*, 131 S. Ct. 1388, 1403 (2011). On federal habeas, a petitioner must show that

12  the state court applied *Strickland* to the facts of his case in an objectively unreasonable

13  manner. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam). A "doubly"

14  deferential judicial review is appropriate in analyzing ineffective assistance of counsel

15  claims under § 2254. *See Pinholster*, 131 S. Ct. at 1410-11; *Harrington v. Richter*, 131 S.

16  Ct. 770, 788 (2011) (same); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same). The

17  general rule of *Strickland*, *i.e.*, to review a defense counsel's effectiveness with great

18  deference, gives the state courts greater leeway in reasonably applying that rule, which in

19  turn "translates to a narrower range of decisions that are objectively unreasonable under

20  AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough*

21  *v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not

22  whether counsel's actions were reasonable. The question is whether there is any

23  reasonable argument that counsel satisfied *Strickland*'s deferential standard."

24  *Harrington*, 131 S. Ct. at 788.

25      ### 1.     **Failure to Lodge Transcripts**

26      Petitioner claims that his trial counsel failed to lodge the transcripts of his first trial

27  and that of the co-defendant's trial. When his appellate counsel moved to augment the

28  record with these transcripts on appeal, the motion was denied. Petitioner claims that trial

1   counsel's failure to lodge the transcripts resulted in prejudice because had the record been

2   augmented, his appeal was likely to have succeeded.

3         On appeal, Petitioner presented this claim as a request that the state appellate

4   reconsider a motion to augment the record to include the transcripts at issue. The

5   California Court of Appeal denied the motion, and also rejected the suggestion that

6   Petitioner's trial counsel rendered ineffective assistance in this regard:

7         Appellant asks us to revisit our denial of a motion to augment the
    record on appeal to include transcripts from his first trial and Richard

8         Lewis's trial. He acknowledges that these transcripts were not a part of
    the superior court file in the case before us, having been neither filed nor

9         lodged in the record (Cal. Rules of Ct., rule 8.155(a)(1)(A)), but he
    suggests that augmentation requests should be construed liberally.

10        Appellant claims the transcripts, which were referred to by counsel and by
    the trial court, are necessary to assess whether his right to due process was

11        violated by the introduction of the aiding and abetting theory on retrial.

12        We deny the request to reconsider our ruling. "Augmentation does
    not function to supplement the record with materials not before the trial

13        court. [Citations.]... Rather, normally 'when reviewing the correctness of a
    trial court's judgment, an appellate court will consider only matters which

14        were part of the record at the time the judgment was entered.'
    [Citations.]" (Vons Companies, Inc. v. Seabest Foods, Inc. (1996) 14

15        Cal.4th 434, 444, fn. 3; see also People v. Waidla (2000) 22 Cal.4th 690,
    703, fn. 1.) Appellant has not demonstrated any exceptional

16        circumstances that would justify a deviation from this rule in this appeal.

17        We also note that the parties fully litigated issues concerning the
    instructions on aiding and abetting and the consistency of that theory with

18        the position previously taken by the prosecutor. We have assumed that
    counsel, when arguing their positions on the aiding abetting issue,

19        accurately described the theories relied upon in the trial of Richard Lewis
    and in appellant's first trial. We do not require the full transcripts of those

20        prior proceedings to resolve the issues presented in this appeal, and we
    reject any suggestion that defense counsel provided ineffective assistance

21        of counsel in failing to make those transcripts a part of the trial court
    record in this case.

22

23  (Op. at 23.)

24        Applying the "doubly" deferential standard of review to this claim under § 2254,

25  this Court cannot conclude that the state court unreasonably applied *Strickland* in

26  rejecting this claim. The record shows that defense counsel thoroughly presented the

27  issue of inconsistent theories to the trial court for evaluation by relying on specific

28  statements and claims made by the prosecutor at the first trial rather than submitting the

1    entire trial transcripts: defense counsel excerpted relevant portions of both parties'

2    opening statements from the Lewis trial, (3 CT 685); he referenced various motions filed

3    in the Lewis case, (3 CT 686); and defense counsel excerpted statements from the

4    prosecutor's opening statements in Petitioner's first trial, (*id.*).  Lastly, in defense

5    counsel's declaration submitted with Petitioner's state habeas petition, he stated that he

6    "believed that proceeding in this manner was sufficient to preserve the issue on appeal."

7    (Ans. Ex. 10.)  It was not objectively unreasonable for counsel to decide that presenting

8    the issue with specific excerpts and references to the relevant record – rather than lodging

9    the entire trial transcripts – was sufficient for the trial court to consider the matter and to

10   preserve the issue for appeal. *Strickland*, 466 U.S. at 687-88.

11       Even if we assume that counsel's performance was deficient, Petitioner fails to

12   show that he was prejudiced by it.  As Respondent points out, and Petitioner does not

13   dispute, there was no disagreement between the parties about the factual position taken by

14   the prosecution at Petitioner's first trial or Lewis's trial with respect to the roles of

15   Petitioner and Lewis or about how the prosecution argued its theory for the case in

16   Petitioner's prior and current trials. (Ans. at 28.)  In Petitioner's response to the

17   prosecution's motion to proceed on alternate theories in his retrial, Petitioner did not

18   challenge the prosecution's recitation of the facts but merely challenged the legal

19   significance of what occurred.  (*Id.* at 29.)  Accordingly, Petitioner fails to show why the

20   entire transcripts of his first trial and Lewis's trial would have been necessary to decide

21   the issue which was accurately and thoroughly presented to the state courts.  Furthermore,

22   Petitioner fails to point out what specific critical information was contained in the trial

23   transcripts that defense counsel overlooked that would have substantially bolstered his

24   inconsistent theories claim.  Because there was nothing more that the trial transcripts

25   could have provided for the trial and appellate courts to decide the issue of inconsistent

26   theories, it cannot be said that Petitioner would have obtained a different result had

27   counsel lodged the entire transcripts.

28       Because Petitioner has failed to show that counsel's performance with respect to

1   the lodging of trial transcripts was deficient and that he was prejudiced by it, the Court

2   finds that the state court's rejection of this claim was not contrary to, or an unreasonable

3   application of, clearly established Supreme Court precedent, nor was it based on an

4   unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. §

5   2254(d).  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 2.    Failure to Counter Prosecution's Alternative Theory

7   Petitioner's claim is that counsel rendered ineffective assistance for failing to offer

8   statements by the prosecutor made during his first trial and during the trial of Richard

9   Lewis – that Petitioner was the shooter and Lewis was the driver – to counter the

10  prosecutor's argument that Petitioner was an aider and abettor during his second trial.

11  The Court of Appeal rejected this claim on direct review:

> Appellant argues that his trial attorney should have presented evidence that during his first trial and the trial of Richard Lewis, the prosecutor argued that appellant was the shooter and Lewis was the driver of the getaway car.  Appellant suggests that such evidence would have undermined the prosecutor's efforts to argue that he could be guilty as an aider and abettor.  We reject the claim, because appellant has failed to demonstrate either error or prejudice.

> A defendant asserting ineffective assistance of counsel has the burden of showing: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice, i.e., a reasonable probability that the result of the proceeding would have been different were it not for the error.  (*Strickland v. Washington* (1984) 466 U.S. 668, 686, 688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216, 218.)  "Reviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions. [Citation.]" *People v. Lucas* (1995) 12 Cal.4th 415, 442.) Defendant counsel is not required to make futile motions or engage in idle acts, such as the instruction of evidence he or she reasonably believes to be inadmissible. (*People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1409; see *People v. Davis* (1995) 10 Cal.4th 463, 503.)

> Appellant has not demonstrated that his trial counsel was ineffective in failing to offer the prosecutor's prior statements about the crime because he has not demonstrated that such statements would have been admissible. The statements were not themselves evidence and were not probative of the underlying facts.  "The prosecutor, after all, was neither a participant nor a witness, and has no knowledge of the facts other than those gleaned from the witnesses and other available evidence." (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1263.)

As appellant notes, federal case law has recognized some circumstances in which a court may admit prior statements by counsel regarding the facts of the charged crime. In *United States v. Salerno* (2d Cir. 1991) 937 F.2d 797, 812, rev'd. on other grounds in *United States v. Salerno* (1992) 505 U.S. 317, 322, the court concluded that statements made by the prosecutor during closing argument in a former trial were not inadmissible per se, but were subject to a showing that (1) they involved an assertion of fact inconsistent with similar assertions in the subsequent proceeding; (2) they were equivalent to testimonial statements by the client; and (3) the inference to be drawn from the inconsistency is fair one. (See also *United States v. McKeon* (2d Cir. 1984) 738 F.2d 26, 33 [applying same analysis to closing argument by defense counsel].)

These authorities do not assist appellant. Here, the prosecutor's earlier statements to the effect that appellant was the shooter and Lewis was the driver were not factually inconsistent with statements made during appellant's retrial. The prosecutor did not switch positions on retrial and claim that Lewis was the shooter and appellant was the driver; rather, he maintained that appellant was the shooter, but was guilty even if the jury could not determine his exact role in the crimes.

Even if we assume the prosecutor's prior statements would have been admitted if offered by defense counsel, the omission of that evidence was not prejudicial. Absent a true inconsistency in the prosecutor's positions, the jury would have drawn no negative inference from the former arguments regarding appellant's and Lewis's roles in the crimes. It is not reasonably probable the result of the trial would have been more favorable to appellant had the evidence been introduced. (*Strickland*, supra, 466 U.S. at pp. 694-695.)

(Op. at 21-23.)

Assuming that counsel could have admitted the prosecutor's statements and that his failure to do so was deficient, Petitioner fails to show that he was prejudiced by it. *See Strickland*, 466 U.S. at 697. The prosecutor consistently and repeatedly maintained during the second trial that Petitioner was the shooter: "[i]f Richard Lewis is involved, he's the get-away driver, which the evidence supports, (35 RT 2922); "Richard Lewis, driver; defendant shooter", (*id.* at 2945); "[s]o I have been arguing to you the entire time, the defendant is the person that... shot George Tang, killed Christie Chan," (*id.* at 2947-48); "but the evidence is so much more strong and overwhelming and beyond a reasonable doubt that [petitioner] was the shooter in this case, right, under the theory of felony murder, it's him as the shooter and as the person that went in there and, point blank, shot George Tang in the face and shot Christie Chan and killed her," (36 RT 3044). Accordingly, it cannot be said that the prosecutor made inconsistent statements between

1  his first trial and second trial in this regard, and the state appellate court reasonably

2  determined that "[a]bsent a true inconsistency in the prosecutor's positions, the jury

3  would have drawn no negative inference from the former arguments regarding appellant's

4  and Lewis's roles in the crimes." *See supra* at 25.

5       The prosecutor discussed the aider and abettor liability as a theory of guilt only to

6  address the possibility that the jury had lingering questions about whether Petitioner or

7  Lewis pulled the trigger, notwithstanding his view that there was overwhelming evidence

8  of Petitioner's role as the shooter. (35 RT 2948-49; 36 RT 3043-44.) Based on this

9  record, Petitioner has failed to show that the result of the proceeding would have been

10 different but for counsel's allegedly deficient performance. *See Strickland*, 466 U.S. at

11 694. Accordingly, the state court's rejection of this claim was not contrary to, or an

12 unreasonable application of, clearly established Supreme Court precedent, nor was it

13 based on an unreasonable determination of the facts in light of the evidence presented. 28

14 U.S.C. § 2254(d). Petitioner is not entitled to federal habeas relief on this claim.

15     **C.**    **Contradictory Theory of Aiding and Abetting (Claim 4)**

16      Petitioner's last claim is that the presentation of aiding and abetting as an

17 alternative theory of guilt deprived him of due process because the prosecution had

18 previously taken the position that Petitioner was the shooter.

19      The Court of Appeal rejected this claim on direct review:

20       Appellant argues, as he did at trial, that the prosecution's reliance
   on aiding and abetting as an alternative theory of guilt deprived him of due

21 process even if that theory was supported by the evidence. He notes that
   during his first trial and the separate trial of Richard Lewis (in which

22 Lewis was acquitted), the prosecution took the position that appellant was
   the shooter and Lewis was the driver of the getaway car. Appellant

23 characterizes the introduction of aiding and abetting into his second trial as
   an "espousal of mutually contradictory theories" in successive trials, of the

24 type prohibited by the decision in *In re Sakarias* (2005) 35 Cal.4th 140
   (*Sakarias II*). We are not persuaded.

25
         In *Sakarias II*, two defendants were separately tried for the capital

26 murder of a single victim. (*Sakarias II, supra*, 35 Cal.4th at pp. 144.)
   During the codefendant's trial, the prosecutor attributed the fatal blows to

27 the victim solely to the codefendant, but subsequently, in the defendant's
   trial, attributed the same fatal blows solely to the defendant. (*Id.* at pp.

28 147-149.) The Supreme Court concluded the prosecutor acted improperly

by "attributing to each petitioner in turn culpable acts that could have been committed by only one person." (*Id.* at p. 145.) "[T]he People's use of irreconcilable theories of guilt or culpability, unjustified by a good faith justification for the inconsistency, is fundamentally unfair, for it necessarily creates the potential for – and, where prejudicial, actually achieves – a false conviction or increased punishment on a false factual basis for one of the accuseds." (*Id.* at pp. 159-160.)

The prosecutor in this case did not present inconsistent factual theories or false evidence. He consistently maintained, as he had during the first trial, that appellant was the shooter and Richard Lewis was the driver of the getaway car. But he recognized that the jury, if unable to determine who fired the fatal shot, could still agree that appellant and Lewis acted together. This did not amount to an inconsistency or a change in the factual theory of the case; it was simply a recognition that principals in a crime may be equally guilty regardless of their exact roles. (See *Thompson, supra,* 49 Cal.4th at pp. 112-120 [evidence sufficient to support defendant's conviction for robbery and felony murder as either direct perpetrator or aider and abettor]; *People v. McCoy* (2001) 25 Cal.4th 1111, 1120 [aider and abettor doctrine obviates the need to decide who was the aider and abettor and who was the direct perpetrator].)

Unlike the situation presented in *Sakarias II,* there is no suggestion that in the course of presenting an alternative theory of aiding and abetting, the prosecutor withheld or misrepresented the available evidence so as to make appellant appear more culpable than he actually was. By acknowledging that the jury might return a guilty verdict under the aiding and abetting instructions, the prosecutor was actually allowing for a lesser penalty, in that an aiding and abetting theory would not have supported the enhancements or the special circumstance allegation as it was presented in this case. [FN7] The prosecutor's conduct was markedly different from the situation in *Sakarias II,* and did not deprive appellant of due process.

> FN7. A felony-murder special circumstance may be applied to an accomplice who is not the actual killer, but only upon a showing that the person intended to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subds. (c), (d); *People v. Proby* (1998) 60 Cal.App.4th 922, 927.) Appellant's jury was given a version of CALCRIM No. 730 that permitted a true finding only if *appellant* caused the death of another person.

(Op. at 19-21.)

Respondent asserts that Petitioner's due process claim fails because the state court's denial of this claim was neither contrary to nor an unreasonable application of federal law "simply because no such law exists." (Ans. at 22, citing *Stevenson v. Lewis,* 384 F.3d 1069, 1072 (9th Cir. 2004); *Carey v. Musladin,* 549 U.S. 70, 77 (2006).) In *Bradshaw v. Stumpf,* the Supreme Court "express[ed] no opinion on whether the prosecutor's actions [prosecuting defendants based on inconsistent theories] amounted to

1  a due process violation, or whether any such violation would have been prejudicial." 545

2  U.S. 175, 187 (2005).  The concurring opinion also included the observation that the

3  Supreme Court "has never hinted, much less held, that the Due Process Clause prevents a

4  State from prosecuting defendants based on inconsistent theories." *Id.* at 190.  Although

5  the Ninth Circuit has made no ruling on the issue of whether prosecuting defendants

6  based on inconsistent theories violates due process, sister circuits have ruled that there is

7  no clearly established federal law on this issue based on *Stumpf. See Littlejohn v.*

8  *Trammell*, 704 F.3d 817, 852 (10th Cir. 2013) ("we conclude that Mr. Littlejohn's

9  inconsistent-theories argument fails at the threshold because it is not based on clearly

10  established federal law"); *Fotopoulos v. Secretary, Dept. of Corrections*, 516 F.3d 1229,

11  1235 (11th Cir. 2008); *Blalock v. Wilson*, 320 Fed.Appx. 396, 418 n. 26 (6th Cir. 2009).

12  Accordingly, it cannot be said that the state court's rejection of this claim was contrary to,

13  or an unreasonable application of, clearly established Supreme Court precedent.  28

14  U.S.C. § 2254(d)(1).

15       Furthermore, the record shows that the prosecution did not actually present

16  contradictory theories during Petitioner's trial.  As discussed above in Petitioner's

17  ineffective assistance of counsel claim, the prosecution consistently argued that Petitioner

18  was the shooter during his first and second trials, as well as in Lewis's trial, and that

19  Lewis was the getaway driver. *See supra* at 25-26.  The prosecutor repeatedly asserted

20  his theory of the crime in his opening statement, describing in detail Petitioner's specific

21  actions in shooting Tang and his girlfriend, then getting into a waiting car driven by

22  Lewis, and then speeding away.  (23 RT 1308-23.)  His closing argument reiterated his

23  theory, urging that the evidence was "so much more strong and over whelming and

24  beyond a reasonable doubt that [Petitioner] was the shooter in this case... it's him as the

25  shooter and as the person that went in there and, point blank, shot George Tang in the

26  face and shot Christie Chan and killed her." (36 RT 3044.)

27       At the same time, the prosecution acknowledged the inconsistencies in Tang's

28  identification, whose testimony at trial was a key factor: (1) Tang identified Lewis's

1    photograph as having eyes like those of the shooter; and (2) Tang identified Lewis's voice

2    at the preliminary hearing as the one on the cell phone whom he believed was "Gutter,"

3    and who arranged the drug purchase and the location for the deal. (23 RT 1322-23.)

4    Because of Tang's inconsistent identification, there was still a possibility that the jury

5    would believe that Lewis was the shooter and not Petitioner despite the overwhelming

6    evidence. Therefore, the prosecutor requested the aider and abettor liability instruction to

7    ensure that Petitioner would still be liable for the murder and attempted murder thereon.

8    After an extensive hearing, the trial court granted the request and expressly found no bad

9    faith by the prosecutor in advancing an alternative theory of liability; the trial court also

10   noted that the prosecutor had attempted to advance this same theory at Petitioner's first

11   trial, but had been denied because the request was untimely. (21 RT 1175-78.) Lastly,

12   the prosecutor correctly explained this alternative result to the jury during closing

13   argument. (35 RT 2948-49; 36 RT 3043-44.) Based on this record, it cannot be said that

14   the state court's rejection of this claim resulted in a decision that was based on an

15   unreasonable determination of the facts in light of the evidence presented.[8] 28 U.S.C. §

16   2254(d)(2). Petitioner has failed to rebut the presumption of correctness of these factual

17   findings with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Accordingly, he is

18   not entitled to federal habeas relief on this claim.

19

20                                    **CONCLUSION**

21          For the reasons set forth above, the petition for writ of habeas corpus is **DENIED.**

22          The federal rules governing habeas cases brought by state prisoners require a

23   district court that denies a habeas petition to grant or deny a certificate of appealability

24   ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. §

25   2254. Petitioner has not shown "that jurists of reason would find it debatable whether the

26   ──────────

27          [8]Because the Court finds there was no constitutional error, we need not address
     Respondent's argument that Petitioner was not prejudiced by the prosecutor's
28   presentation of alternative theories. (Ans. at 25-26.)

1   petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*,

2   529 U.S. 473, 484 (2000).  Accordingly, a COA is **DENIED**.

3        In light of this denial, Petitioner's request for an evidentiary hearing is **DENIED**

4   as unnecessary.

5        The Clerk shall close the file.

6   **IT IS SO ORDERED.**

7

8   DATED: _October 1, 2014_                

9                                              BETH LABSON FREEMAN
                                              United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28